UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO.: 1:06cr-31-R

UNITED STATES OF AMERICA,                                           PLAINTIFF

v.

DENNYSON WARFIELD,                                                   DEFENDANT

**OPINION & ORDER**

This matter comes before the Court on the Defendant's Motion to Suppress (Docket #17). The Plaintiff, the United States of America ("Government") has responded (Docket #20), and the Defendant, Dennyson Warfield ("Warfield") has filed a memorandum in support his motion (Docket #24). In addition, a suppression hearing was held on this matter in Bowling Green, Kentucky on October 3, 2006. This matter is now ripe for adjudication. For the following reasons, the Defendant's motion to suppress is **DENIED**.

**BACKGROUND**

On March 16, 2006, Kentucky State Police Troopers made a traffic stop on Warfield on Scottsville Road, in Bowling Green, Kentucky. Prior to this date, a confidential informant ("CI") who was working with the Kentucky State Police met with Warfield on two (2) prior occasions in February 2006, where upon the CI purchased three (3) ounces of cocaine powder (2/3 cocaine, 1/3 poweder) on each instance from the Defendant for a price of $2400. In both instances, troopers searched the CI before and after the transaction with the Defendant, and listened in on all correspondences between the Defendant and the CI. A third transaction was set-up between the CI and the Defendant to take place on March 16, 2006. The CI was informed to have the Defendant meet him in Bowling Green so that the CI could purchase eight (8) ounces of cocaine rather than three (3). The troopers indicated that on this particular transaction it was

their intention not to complete the deal, but to intercept and arrest the Defendant beforehand. In addition, before March 16, 2006, the troopers did a background check on the Defendant and discovered that his driver's license had been suspended.

On the evening of the arrest, two (2) marked state police units, one of which was a canine unit, pulled over the Defendant's car. An unmarked state police who was following Warfield that evening noticed that the Defendant's car, which was in the far right lane of a four (4) lane road, was swerving in-and-out of the emergency lane. In addition, the two (2) marked state police units noted that when they passed Warfield's vehicle going in the opposite direction, the Defendant did not dim his headlights as they were approaching his vehicle. Warfield was later cited for these traffic violations.

After pulling over the Defendant, two (2) state police troopers approached the vehicle and then asked Warfield for his driver's license. After running it through, it came back that it was suspended. He was asked to exit the vehicle and was placed into custody for operating on a suspended driver's license. The troopers then asked Warfield if he had any drugs or weapons on him, and he replied that he did not. At that time, the troopers stated that they took the canine unit or "drug dog" out of the car to begin a search of the Defendant's vehicle. The officers noted that as the dog came out of the police car, Warfield, while on the tailgate of his own vehicle, became agitated and began to jump up and down, pulling and adjusting on his pants while handcuffed. The troopers decided to place Warfield in the backseat of their vehicle while they finished their search and investigation.

After placing Warfield in the police cruiser, the drug dog went along the outside of Warfield's vehicle and scratched on the driver's door, indicating an odor of narcotics. The

troopers opened the door and the dog began to dig into the driver's seat. Upon positively marking that area of the vehicle, the dog began to search around the outside of Warfield's vehicle. It went to the area where Warfield had been sitting on the tailgate, and began to scratch at that area, indicating a positive odor of narcotics. However, upon patting down the Defendant at the time of the arrest, the troopers found no drugs on him. In addition, upon searching the vehicle for drugs, the troopers found no narcotics in the vehicle.

     The troopers then proceeded to take Warfield to the Warren County regional jail. Upon his arrival, officers at the jail informed Warfield that because they had been informed by the arresting state troopers that Warfield may possess illegal narcotics on his person, they were going to conduct a strip search. The officers at the jail had been informed by the state troopers who arrested Warfield that a drug dog had made two (2) positive hits on Warfield's vehicle, but that they had not found any narcotics on Warfield after conducting a pat-down search and a search of his vehicle. Warfield was telling the officers that they could not search him without his attorney present. The officers informed Warfield that anyone who enters the jail is subject to a search. At that time, the officers at the jail gave Warfield the opportunity to turn over any narcotics or weapons he may have on his person, informing him that if he turned over the items he would only be charged with a misdemeanor. However, they said if he did not turn over any items, and they were subsequently found upon after a strip search, Warfield would be charged with a felony. Warfield did not turn over any items at that time, so the officers took Warfield into a private room to conduct a search.

     In Kentucky, officers at a jail have five (5) reasons in which they can perform an unclothed search including: 1) a current offense involving felony violence, drug charges or

fugitive status; 2) a criminal history of offenses involving the use of a weapon; 3) institutional behavior, reliable information, history that indicates possession or manufacturing of contraband, the refusal to submit to a clothed pat down search, or a clothed pat down search reveals the possession of drugs or contraband; 4) if the person in custody will have contact with the public because of a contact visit and/or court appearance; and 5) is a court order.

The officers decided to strip search Warfield because they felt he was trying to conceal something based on his actions during the arrest and while he was brought into the jail, as well as the fact that they were informed that Warfield may be in possession of a controlled substance. Six (6) officers went with Warfield into a secured room to conduct the strip search. After removing his handcuffs, the officers noticed that Warfield reached into his "crouch" area and then proceeded to drop a bag of a yellow substance into a crate that was in the secured room. The officers described the bag itself as a bread loaf bag, and in that bag contained another bag with the yellow substance. After dropping the bag into the crate, Warfield placed his hands on the wall. Officer Larry Milan ("Officer Milan") then picked up the bag and handed it to another officer. After that, Officer Milan attempted to resume the search, upon which Warfield struck the officer. The other officers put restraints on Warfield, and he was taken from that room to be processed. The bag tested positive for about eight (8) ounces of crack cocaine, the same amount that was set up to be purchased by the CI.

## DISCUSSION

The Defendant contends that the evidence found during the search was obtained through an illegal search and seizure in violation of the Fourth Amendment of the United States Constitution. In particular, the Defendant argues that the Kentucky State Police improperly

relied upon a tip from an unreliable confidential informant; improperly used a drug dog when conducting the search of Warfield's vehicle; and conducted an illegal strip search on the Defendant because the officers should have obtained a warrant before conducting the search and the Defendant was not going to be processed into general population. The Court will address each of these arguments separately.

### 1. Confidential Informant

The Defendant asserts that the confidential informant used by the Kentucky State Police in this matter was unreliable. In *United States v. Greene*, the Sixth Circuit Court of Appeals stated that "Sixth Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir.2001). In the instant case, prior to the incident on March 16, 2006, the confidential informant worked with the Kentucky State Police on two (2) prior occasions involving cocaine powder transactions with the Defendant. On each instance, the officers successfully relied upon the CI to complete the transactions without complications as the CI gave accurate information as to the location of where the transactions would take place and the amount of the controlled substance in question. Accordingly, the CI used in this matter was reliable.

### 2. The Drug Dog

The Defendant argues that the search of Warfield's vehicle by a drug dog without a search warrant was a violation of the Fourth Amendment, asserting that "the law holds that the sniffing of a person or in the close proximity of a person is a violation of that person's constitutional rights." The Defendant cites no cases or statutes in support of this contention.

5

The Sixth Circuit Court of Appeals, in *United States v. Davis*, recognized that the police may use a drug dog at the scene of the crime so long as the police have a reasonable suspicion that a defendant, and/or his vehicle, may possess narcotics. *United States v. Davis*, 430 F.3d 345, 354-55 (6th Cir. 2005). In *Davis*, the officers conducted a canine search of the defendant's vehicle without a search warrant because they had a reasonable suspicion that the vehicle contained narcotics. *Davis* at 352, 354-55. The Court held that the search was constitutional. *Id.* Accordingly, police officers can conduct a search of a defendant or his vehicle without a search warrant so long as the officers have a reasonable suspicion that the defendant may possess narcotics on his person or in his vehicle.

In the instant matter, the troopers had a reasonable suspicion that Warfield possessed narcotics either on his person and/or in his vehicle, and therefore, had the right to use the drug dog to search Warfield's vehicle. Prior to that evening, the Kentucky State Police had used a CI to complete two (2) drug transactions with Warfield, where the CI exchanged $2400 for approximately three (3) ounces of cocaine powder on each occasion. On March 16, 2006, the troopers had the CI set up another transaction in Bowling Green for the CI to purchase eight (8) ounces of cocaine. The testimony of Trooper Brad Harper indicates that the Defendant was in route to the rendezvous point to complete the transaction when the troopers pulled him over for driving with a suspended license. Accordingly, the troopers had the right to search the vehicle of the Defendant that evening with a drug dog even though they did not have a search warrant because they had a reasonable suspicion that the Defendant possessed illegal narcotics on his person or in his vehicle.

### 3. Strip Search

The Defendant contends that the strip search conducted by officers at the Warren County jail was unconstitutional because the search of his person required the officer to obtain a search warrant because Warfield was not going to be placed in the general population.  In the United States Supreme Court case of *Bell v. Wolfish*, the Court found that a prison policy to conduct a strip search of all persons brought into the facility did not violate the Fourth Amendment so long as the search was reasonable. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  To determine reasonableness, "[i]n each case...requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559; *see also Reynolds v. City of Anchorage*, 379 F.3d 358, 362-63 (6th Cir. 2004) (holding that a warrantless strip search of female juvenile who resided in private juvenile group home, and who was reasonably suspected of using drugs, was not unreasonable, and thus did not violate Fourth Amendment; facility had strong interest in eliminating and preventing drug use on premises, conduct of juvenile and others in facility gave rise to suspicion of drug use, and, while strip search was highly invasive, it was no more invasive than necessary to accomplish its purpose).  If authorities have reasonable cause to conduct a strip search on a person in a prison facility, whether the person ends up in general population is not dispositive in determining whether the search violates the Fourth Amendment. *See Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989).  Authorities have reasonable cause to strip search a person after an arrest if there is a reasonable suspicion that the person "is carrying or concealing a weapon or other contraband." *Id.*

In the instant case, the Defendant, relying on *Masters*, argues that because he was not

going to be mixed in with the general population, the strip search was unreasonable. However, the Defendant misconstrues the holding in that case. In *Masters*, the Sixth Circuit Court of Appeals held that warrantless strip searches conducted without reasonable suspicion that the arrestee was carrying or concealing contraband violated the Fourth Amendment even though the arrestee would ultimately intermingle with the general population at a jail. *Id.* The defendant in that matter was arrested for a traffic violation, but there was no suspicion of contraband on her person. *Id.* For that reason only, the Court held that the warrantless strip search was unconstitutional. *Id.*

Here, the officers at the Warren County jail had reasonable suspicion to strip search the Defendant. Prior to arriving at the facility, the officers at the jail were informed by the Kentucky State Police that Warfield was in route to the prison and that a drug dog had made two (2) positive hits on Warfield's vehicle, but the troopers did not find contraband in the vehicle or after a pat down search. In addition, Warfield, unlike the arrestee in *Masters*, was being pursued that evening in order to arrest him for drug charges. Officials at the Warren County jail knew this before the Defendant arrived at the jail, and upon his arrival gave Warfield an opportunity to turnover any contraband, which Warfield refused to do. Therefore, the Court finds that the officers at the Warren County jail had a valid reasonable suspicion to conduct a warrantless strip search of Warfield to search for contraband on his person.

In applying the *Bell* reasonableness test to this case, the actions taken by the officers at the Warren County jail were reasonable. The scope of the search was reasonable under the circumstances because the Defendant had been pulling at his pants in a suspicious manner and told the officers he did not have any contraband on his person after they had been informed that

he may have them on him. The manner in which the search was conducted was reasonable because the officers did not use unnecessary force in conducting the search. Further, as mentioned *supra*, the officers had justification to conduct the search as they had been informed by the Kentucky State Police that a drug dog had made two (2) positive hits on the Defendant's vehicle that same evening right before the Defendant was brought in. Lastly, the officers conducted the search in a private room that in no way left the Defendant humiliated. Accordingly, the strip search conducted by the officers did not violate the Fourth Amendment because it was a reasonable search.

## CONCLUSION

**IT IS SO ORDERED:**

For the foregoing reasons, the Defendant's Motion to Suppress is **DENIED**.